ASA MAY, ADM'R., &C., AND IN HIS OWN RIGHT, AND WIFE, APPELLANTS, VS. ALVIN MAY AND WIFE, AND OTHERS, APPELLEES.

In the construction of a marriage settlement, the manifest intention of the grantor will prevail over the doubts which might be raised by strict grammatical construction.

Where a father settles by deed of trust upon his certain daughter, certain slaves for life, and provided she married, then in trust for the joint use of herself and husband, and in case of the death of either of them, then in trust for the survivor of them, and upon the death of the survivor, then to the issue that may hereafter be born of said marriage, absolutely, the daughter having married twice, and having issue of both marriages: Held, that the issue of both marriages took, share and share alike.

A judgment in dower for an unascertained sum of money is void.

An administrator cannot bind the estate of his intestate by any contract of

his, and a recognition by him of a claim against the estate, arising subse-
quent to the intestate's death, gives it no additional validity.

Upon the equity of the statute giving dower, the widow will be allowed her
portion of *mesne profits*, from the death of her husband up to the period at
which the dower shall be set off, and the Court, upon proper application,
will refer it to a Master, to state the account and ascertain the widow's
share. But this is not competent to be done by Commissioners in Dower,
acting under the provisions of the statute directing the method to be ob-
served in laying out dower.

It is the duty of an administrator, under the statute regulating his duties, to
make all sales of the personalty at public auction. A reversionary inter-
est in slaves is not the subject of such sale; but that such future vested in-
terest may be subjected to the payment of debts by proceedings in equity,
there can be no doubt.

An administrator or executor may not enter into hazardous bargains, whereby
they jeopardise the interest confided to their care, and a mistake which
works injury is always a ground for relief in equity. The rule in Chan-
cery is, that the purchaser of a reversion must prove that he gave a full
price, and this rule applies with greater force to a purchaser who bore the
relation of trustee to those in remainder.

Appeal from a decree of the Circuit Court of the Middle
Circuit for Jefferson County, sitting in Chancery.

On the first day of May, 1828, Burwell McBride, of South
Carolina, executed a deed of trust to certain trustees, con-
veying to them certain negroes therein named, subject to
the following among other trusts, viz: "for the use of his
daughter Caroline McBride, during her natural life, and in
case she should marry, then in trust to and for the use of
the said Caroline and her husband, during their natural
lives, to take and receive the profit, labor and employment
of said slaves, to their joint use and behoof, and from and
immediately after the death of either the said Caroline or
her husband, leaving issue alive of the said marriage, then
in trust, to permit the survivor to take, have and receive
the profits, labor and employment of the said slaves, to her
or his proper use and behoof, or that the said trustees ap-
ply the rents and profits thereof in such manner, and to

such intents and purposes, as the said survivor shall direct, during the said term, and from and immediately after the death of such survivor, then in trust, to and for the equal benefit and behoof of the issue that may hereafter be born of the said marriage."

Shortly after the execution of this deed of trust, the said Caroline McBride intermarried with Alexander Murray, who died in Jefferson county, Florida, early in the year 1836, leaving the said Caroline his widow, and Margaret, the wife of Asa May, and Caroline, the wife of Alvin May, his two children, who were infants, the issue of said marriage, surviving.

In March, 1836, administration on the estate of said Alexander Murray was duly committed to Burwell McBride, by the then County Court of Jefferson County, Florida.

In 1839, Caroline, the widow of said Alexander Murray, intermarried with Richard B. Cole, who afterwards, and about the third day of April, 1848, died intestate, in Jefferson county, leaving the said Caroline his widow, and five infant children, the issue of the said marriage, surviving. On the 25th day of September, 1848, administration on the estate of Richard B. Cole was duly granted in the county of Jefferson, aforesaid, to said Caroline, his widow.

On the 18th day of September, 1852, the said Caroline, widow of said Richard B. Cole, and the original *cestui que trust*, in said deed of trust, died intestate, in the county of Jefferson, aforesaid, leaving Margaret, the wife of Asa May, and Caroline, the wife of Alvin May, and the five infant children of Richard B. Cole, her children and heirs at law. Administration on her estate was, on the 24th day of November, 1852, duly granted to complainant, Asa May, and on the same day, administration *de bonis non* on the estate of Richard B. Cole, was also granted to complainant, Asa May.

In the year 1846, Asa May intermarried with Margaret, one of the children of the marriage of Alexander Murray to Caroline McBride, then under age, and in the year 1848, Alvin May intermarried with Caroline, another of the children of said marriage, who was also at the time under age.

Alexander Murray at his death owned considerable property but his estate it is alleged was embarrassed by debts. His widow Caroline being entitled to dower and widow's shares in his estate real and personal, in conjunction with her subsequent husband Richard B. Cole, after their intermarriage, applied by petition to the Superior Court of Jefferson county, to have her dower out of the estate of Alexander Murray set off to her, and obtained an allotment of slaves to her for the term of her natural life. In addition to the slaves allotted, the Commissioners reported and the Court ordered that one third of the nett proceeds of the cotton crop grown on the plantation of Alexander Murray during the years 1836, 1837, 1838 and 1839, be paid to the said petitioners by the administrator of said Alexander Murray.

The bill alleges that in the execution of said decree with respect to the interest of said Caroline in said crops the said administrator calculated the "nett proceeds" of the crops of said years by referring to the account sales and deducting only the expenses of such sales, whereas in truth and in fact, the nett proceeds of the crops of said years could only be correctly ascertained and adjusted by deducting from the sales of the crops, the expenses of the plantation, including the overseer's wages, provisions and supplies, medical bills, taxes, farming utensils purchased and other expenses incident to the growing and gathering of said crops, as well as the expenses of the transportation and sale of the same ; and that the said administrator committed an error and mistake in the adjustment of the amount of said "nett proceeds,"

which can and ought to be corrected without injury or loss to the said Burwell McBride, the said administrator.

The bill also alleges that the said McBride, administrator of said Alexander Murray, having so erroneously estimated the in'erest of said Caroline Cole in said crops, did on the 7th day of January, 1843, in consideration of the sum allowed said Coroline as her interest in said crops, viz : the sum of $4,878 05, and of the further sum of $48 44 reported to be due said Caroline in cash to make up her one-third of the chattels allotted to her, execute and deliver to Richard B. Cole a bill of sale and conveyance of the reversion of the estate of Alexander Murray, in and to the slaves allotted for dower to said Caroline Cole, under the mistaken belief that said conveyance and said sale to said Cole for said consideration, were not injurious or prejudicial to the interests of the children and heirs of Alexander Murray.

The bill charges that said reversionary interest of the estate of Murray in said slaves was really worth not only more than the true balance then due to Mrs. Cole for her interest in the crops, but also more, and largely more, than the incorrect and erroneous estimate which formed the basis of the settlement made by said Burwell McBride, administrator of the estate of said Murray.

The bill also charges that the said Burwell McBride, as administrator as aforesaid, had no authority or power to sell such reversionary interest—that the price was inadequate, and that to the heirs at law of said Alexander Murray, the said slaves allotted as aforesaid ought to revert, and be distributed between Margaret, the wife of Asa May, and Caroline, the wife of Alvin May, in which event the complainants are willing that the slaves conveyed by the deed of trust aforesaid and their increase shall be distributed between all the children of said Caroline Cole.

The bill further alleges that the complainant Asa May,

feels it his duty to present fully all the facts connected with the title to said slaves, and to distribute them as the proper-ty of Richard B. Cole between his children, if they are in the opinion of the Court really the property of the estate of said Richard B. Cole. That said Asa May as administra'or de bonis non of the estate of said Richard B. Cole cannot as-sume to act upon his individual views, and for as much as a conflict exists between the claims of Margaret, the wife of said Asa May, and of said Asa May in her right, and the claims of said Asa May as administrator de bonis non as aforesaid, and his duty to the infant children of Richard B. Cole, the bill charges that the said Asa May is entitled to the advice and direction of the Court in the premises.

The complainants disclaim all desire for any re-examin-ation or re-opening of the accounts of Burwell McBride, administrator of Alexander Murray, for the purpose of sub-jection him to any liability to them on account of his said administration, and conclude with a prayer that the Court may set aside the sale from McBri'e to Richerd B. Cole, and direct that the slaves therein conveyed be distributed between Margaret, the wife of Asa May, and Caroline, the wife of Alvin May, who are the legal heirs of Alexander Murray, deceased, and also for general directions and the advice of the Court.

The defendants, Alvin May and wife, admit in their an-swer all the allegations in the bill and consent to all orders and directions prayed for therein.

The infant defendants who are the children of Richard B. Cole by their guardian *ad litem*, insist upon ther right to participate in the property conveyed by the deed of trust above mentioned, and also that the conveyance made by Burwell McBride to Richard B. Cole of the reversionary in-terest of Murray's estate in the dower negroes, was a good and proper conveyance upon a good and valuable consid-

eration, and should not be set aside. They deny that the sum of money allotted to Mrs. Cole as dower out of the crops of Murray's estate was too large or erroneously estimated or that the reversionary interest in the slaves conveyed was more valuable than the sum so allotted. They claim that these slaves should be distributed as the property of the estate of Richard B. Cole, equally among them to the exclusion of said Margaret, wife of Asa May, and Caroline, wife of Alvin May, who are the heirs at law of Alexander Murray.

The Commissioners appointed under the order of the Superior Court for the allotment of dower, in their report say: "The Commissioners having been informed of other property which for obvious reasons, to-wit: the absence of the administrator, cannot be exhibited to them, recommend that the applicant for dower be allowed the third of nett proceeds of the crops of cotton made on the plantation of the estate during the years 1836, '37, '38 and '39, when said amount can be ascertained."

The complainants exhibited to the Court the following certified copy of a paper writing which was read in evidence:

1837.—Amount of 66 Bales Cotton:
February 7—Sold Wm. Maner crop of 1856,....$4,010 20
1838.
March 8—Amount 73 bales sold John B. Collins, 2,404 07
                     28 "      "  J. B. Collins,...   657 40
                     93 bales entire crop 1837.
1839.
Jan.  1—Amount 22 bales sold Gamble & Reid,..   886 56
Feb.28—          74 "      "  by Legan & D. H., 3,799 05
                     06 "    entire crop of 1838.
1840.
Feb.  7—Amt. 31 bales sold by W. Mathers,......  1,190 52
May 22—          59 "      "  "  Legan & D. Hear. 1,186 31
                     90 "   entire crop of 1839.    —————
                                              $14,634 17

$14,131 17 ⎞  One third of this amount I am or-
——————— ⎬  dered to pay to R. B. Cole and wife,
  4,878 05 ⎠  amounting to..................$4,878 05

A reference to my account current in the Clerk's office, Monticello, will perhaps be necessary, as I may be in error from this hurried statement in the exact, amount due Mr. Cole.

State of Florida, ⎞  I, C. G. Fife, Clerk of Jefferson Cir-
Jefferson County. ⎠  cuit Court, do certify that the forego-
ing is a true copy of the original now upon file in my office.

. In testimony whereof I have hereto set my hand and
[L.S.]  affixed the seal of said Court, this 30th day of
June, 1848.        CRAVEN G. FIFE, Cl'k.

The complainants also exhibited to the Court the following certified copy of a paper writing which was also read in evidence:

Be it remembered, That I, Richard B. Cole, have this day received from Burwell McBride, administrator of the estate of Alexander R. Murray, a bill of sale of the right, title and reversion in the following slaves which on petition were allotted to me in righ of my wife, for the term of her natural life, by the Honorable Samuel James Douglas, Judge of the Superior Court of the Middle District of Florida, at a term holden in April, 1842.

The names of said slaves are as follows: George, Marion, Isaac, Hannah, George, jr., Dick, Paul, Saphronia, Robin, Dandy, Jane, Ellen, Jim, Peggy, jr., Judy, Tarner, Ned, John, Minns, jr., Charlotte, Stephen, July, Ben, Martha; in full discharge and payment of the sum of $4,878 05, being one third part of the crops of the years 1836, 1837, 1838 and 1839, allowed by said decree; also in full discharge and payment of the sum of $39 32 allowed me by the Commissioners in their report on said petition, and I do hereby acquit and discharge the said administrator and the estate he

represents from all claims and demands, both in law and equity which I have in right of my wife, the said Caroline.

In testimony whereof I have hereunto set my hand, this 7th day of January, 1853.                    R. B. COLE.

$4,878 05⎫
     38 32⎪  Signed in presence of us.
‾‾‾‾‾‾‾‾‾⎬            J. McCANTS,
$4,516 37⎭            T. J. HEIR.

Territory of Florida, ⎫  Be it remembered, That on the
   Jefferson County.  ⎭ seventh day of January in the year of our Lord one thousand eight hundred and forty-three, R. B. Cole, the person who executed the foregoing instrument of writing, came personally before me the subscriber, Clerk of the County Court for the county aforesaid, and acknowledges the same to be his voluntary act and deed for the use and purposes therein mentioned, whereupon I have duly recorded the same.

In witness whereof I have hereunto set my hand and [L.S.] the seal of said Court, the day and year above written.                    WM. BUDD, Cl'k.

State of Florida,    ⎫  I, Thomas J. Chace, Judge of Pro-
   Jefferson County. ⎭ bate in and for said county, do hereby certify that the foregoing is a true and correct copy of voucher No. 29 in account current of Burwell McBride as administrator of the estate of Alexander R. Murray, which said account was filed and approved at March term, 1843, as appears of record in my office.

In testimony whereof I have hereunto set my hand and affixed my seal of office, this thirtieth day of June, one thousand eight hundred and forty-eight.
                    THOMAS J. CHACE,
                         Judge of Probate.

The Court below decreed that so much of the prayer of the bill as asks that the deed from McBride to Richard B.

Cole, conveying the reversion of the dower n groes be set aside, be refused, and that the slaves named in the deed of trust from McBride for the benefit of his daughter, and their increase, be declared to belong to Margaret, the wife of Asa May, and Caroline, the wife of Alvin May, who are the children of the marriage of said Caroline Cole, deceased, with Alexander Murray, her first husband.

From this decree the complainants appealed.

*Archer & Papy* for appellants.

*Bolling Baker* for appellees.

Pearson, J., delivered the Opinion of the Court:

The first question presented in this record for decision is as to the proper construction of the deed of settlement of McBride, in trust for the benefit of his daughter Caroline.— Caroline having twice married, and having issue by each marriage, the question is whether both sets of children take in remainder, or only those of the first marriage.

The trusts declared in this deed are in relation to certain slaves which are conveyed to trustees to and for the use of the said Caroline during her natural life, and in case she should marry, then in trust for the joint use of herself and husband, and provided either of them should die, then in trust for the survivor of them, "and from and immediately after the death of such survivor, then in trust to and for the equal benefit and behoof of the issue that may hereafter be born of said marriage, and the representative and representatives of such as may be deceased, they taking amongst them a parent's share, to be equally divided to them, their executors, administrators and assigns forever, and in default of issue of the said Caroline McBride by her husband at the death of the survivor of them, in trust to and for the sole use and benefit of the heirs of the said B. McBride, share and share alike."

The Court is unanimously of opinion that under a proper construction of this deed both sets of children should take share and share alike ; they were alike the objects of the grand-father's care and the children of his daughter, who was the meritorious cause of his bounty. The context shows plainly that it was his object to settle a life estate upon his daughter to be enjoyed jointly with her husband, provided she married, but that the remainder should be a provision for her issue. There is nothing in the deed itself to show that any particular marriage was in contemplation at the time of its execution, nor has any evidence *aliunde* been advanced to connect the deed with the particular marriage to Murray, the first husband. Suppose all the children had been the issue of the second marriage to Cole ; can it be doubted that they would have taken in remainder as the issue of his daughter and the objects of the grand-father's solicitude ? In the construction of marriage settlements the manifest intention of the grantor will prevail over the doubts which might be raised by a strict grammatical construction. The cases of Beale vs. Dodd. 1 T. Rep. 202, and 1 D. and E. 193 are conclusive in support of these views, and we do not consider it necessary to extend this argument, since we are so fully sustained in this construction both by authority and the plain intention of the grantor.

The next question is as to the validity of the transfer made by McBride, administrator of Murray, of the reversionary interest of that estate in the negroes allotted to his widow for dower, in satisfaction of a claim against the estate presented in her behalf by her second husband Cole. To determine this question several things are to be considered.

The first inquiry is as to the nature of the debt or claim for which this reversion was bartered.

28

To ascertain this we must look to the proceedings in the Court of law had under our statute for the laying off and assignment of Mrs. Murray's(then Mrs. Cole)dower. It seems to have been upon the report of the commissioners in dower in that case, that this claim first arose.    Their report says, " The Commissioners having been informed of other pro* perty which for obvious reasons, to-wit : the absence of the administrator cannot be exhibited to them, recommend that the applicant for dower be allowed the third of nett pro- ceeds of crops of cotton made on the plantation of the es- tate during the years 1836, '37, '38 and '39, *when said amount can be ascertained.*"

Subsequently an account is filed in the Clerk's office of the sales of the cotton crops during the several years mentioned in the report, concluding with a division, giving Mrs. Cole 4,878 05-100 dollars, but with the usual mercantile E. E., and-appending thereto a memoranda in these words : " A reference to my accounts current in the Clerk's office, Mon- ticello, will perhaps be necessary, as I may be in error from this hurried statement in the exact amount due Mrs. Cole."

This account though not authenticated by any signature, seems to have been incorporated with the proceedings in that case, connects itself with them by its contents, and is made the basis of the subsequent settlement of this claim by the administrator, as appears from Cole's receipt to him. This receipt shows that in consideration of the release of the widow's share of the four cotton crops, amounting to the exact sum stated in this account, the administrator trans- ferred the reversion in the slaves allotted her for dower, to Cole.

The Commissioners' report and this account are certified as being on file in the Clerk's office by the Clerk of Jeffer- son superior Court.    And although it does appear that the report has been confirmed by the Court, yet the confirma-

tion is in the language of the report itself and assigns one-third of the cotton crops to the widow, without stating the amount of the same. Now it remains to be seen how far this establishes a debt from Murray's estate in favor of Mrs. Cole. It appears to us that the mere appointment of Commissioners by the Sheriff to make partition, clothes them with no further authority than to perform an executive duty prescribed by statute and make their report to the Court, which report has no conclusive validity until confirmed by the Court; otherwise the Court would be ousted of its jurisdiction and it would be transferred to the Commissioners summoned by the Sheriff. Again if it should be said that the report of the Commissioners was of authority to establish this claim, it must be considered what was the extent of their powers. Our statute provides that the Commissioners shall allot and set off to the widow one-third part of the real estate of which her husband *"died, seized and possessed,"* and at the same time "shall allot and set off" to such widow her portion of the personal estate of which her husband *died possessed.* Did the husband in this instance die possessdd of the annual crops of his plantation made during four successive years subsequent to his death? Although the widow might have had some sort of equitable claim to a portion of the income of the estate anterior to the assignment of her dower, yet was it competent for these Commissioners, acting under statutory regulations, to adjudicate and determine that question as to *mesne profits* without the sanction of the Court; and even if such extraordinary power were accorded to them, they have not accomplished their work. Their business is mainly, if not entirely, to divide the property of the estate in specie, but here they have gone into matters of account fit only for reference to a master, and at length awarded no sum of money as due out of the proceeds of these four crops, but merely "recommend

that the applicant for dower be allowed one third of the nett proceeds" of the crops mentioned, "when said amount can be ascertained." Can there be a conclusive judgment for any other than an ascertained sum ? Is it not the office and the very essence of a judgment to ascertian the amount of a debt ?   There is in this instance no such ascertainment, but merely a recommendation to the proper tribunal to allow to the applicant a certain proportion of the subject matter, when the amount was ascertained.   Now it is manifest that the amount of such portion has never as yet been ascertained either by the Commissioners or the judgment of the Court.   The statement on file in the Clerk's office disobeys the recommendation of the Commissioners and allows the widow one third of the gross proceeds instead of the *nett* proceeds of the four crops, and to this statement itself is appended the initials for *errors* excepted, together with a declaration that it may be wrong on account of the absence of accounts and the hurried manner in which it is made. This statement is the only distinct evidence of the value of these crops presented, and it departs from the rule of calculation recommended in the Commissioners' report and confirmed by the Court, and thereby reaches a conclusion inconsistent therewith.   If it is evidence to charge the estate of Murray, then it must be equally evidence to discharge that estate to the extent of the evidence it affords of errors and mistakes in making up the account.   It is said however, that the receipt taken by the administrator, McBride, from Cole for the precise sum ascertained by this statement on that account, amounts to an acknowledgement on his part that such sum was due.   On the contrary it appears to us that it only affords evidence that the administrator had only proceeded upon his original error in his settlement of this claim.— But it is a very familiar principle that the administrator has no power to bind the estate by any contract or promise of

his, and his negotiation could give no higher validity to a claim like this, originating subsequent to the death of his intestate, than it previously possessed.

Upon the equity of the statute giving dower, the widow will be allowed her portion of *mesne profits* from the death of the husband up to the period at which the dower shall be set off, and the Court upon proper application will refer it to the master to state the account as to *mesne profits*, and ascertain the widows portion; but this is not competent to be done by Commissioners in dower, acting under the the provisions of our statute directing the method to be observed in laying out dower. See Thom. Dig. p. 186. This then is a claim in the nature of dower unascertained by any competent authority, and in the estimate of which the administrator has fallen, by his own showing, into gross errors and mistakes. Such is the claim presented by Cole and wife against the estate of Murray.

It now remains to examine the duty and authority of the administrator to settle it in the mode which he has adopted. We have seen that he could not create it and that he could not adjudicate it, and that it had not been adjudicated and ascertained either by the commissioners in dower or by the judgment of the Circuit Court. Why then should he assume to cancel it by an assignment and conveyance of the most important interest of the estate, to the claimant? That this transaction was private and that no public sale of the reversion was made, was not contested in the argument, and is sufficiently attested by the receipt given by Cole to the administrator explaining the whole transaction. Cole it will be remembered, stood in privity with the estate of Murray by reason of the accrual of his marital rights upon intermarriage with the widow, and was dealing with the administrator for the expectancy of the heirs in this reversion, upon a demand claimed in right of his wife, and for

222                    SUPREME COURT.

May, Adm'r., &c., vs. May and Wife, et al.—Opinion of Court.

property then in his possession in the same right. Of the quality and value of this property he therefore must have been the best judge, for it appears that the administrator, McBride, was a citizen of South Carolina, where the deed of settlement was executed, and that the commissioners in dower complain that all thé property of the estate was not exhibited to them by reason of his absence. His account of the sales of the four crops, it seems, was made in the absence of vouchers and erroneously, and finally he is made a party to this bill by publication, not being a resident of this State. It is manifest, therefore, that the administrator was in a condition, whatever might have been his intentions, to be imposed upon, and to commit errors and mistakes. This Court in the case of Le Barron and Colquit vs. Fauntleroy, 2 Fla. Rep. 294, distinguishing between our system and the old common law, defines the administrator to be "an agent or officer merely, for the settlement of the estate, with no further interest than commissions and fees." He has not therefore as at common law, a vested right to the personalty, and may not dispose of it at his good pleasure, but is "an agent or officer merely," and must proceed *sub modo* according to the statutes which guide and govern and restrain him. According to the English authorities, a reversion is assets in the hands of the administrator coupled with an interest in himself, and like all other assets of the estate it was in his power to dispose of it at private sale, and to confer on the purchaser a good title, though he still remained liable to the distributees for any fraud or collusion in the sale. This interest "which is attended with such important consequences" in the case above referred to, is declared to be "expressly done away" by our statute. It was clearly then the duty of the administrator to pursue the statutory regulations defining his duties, provided he found it necessary to make sale of the reversion in question•

The 1st and 2d paragraphs of sec. 6 Tho. Dig. 202, prescribe the mode in which the personalty shall be disposed of by the administrator. We think these two sections, which must be construed together, as they are part of the same law, clearly indicate the intention of the Legislature that all such sales should be public. Let us see now whether a reversion can be the subject of a public sale. That such a sale cannot be made by a Sheriff of the remainderman's interest pending the life estate, is expressly decided in Dargan and Bradford vs. Richardson, Dudley So. Car. Repts., 1 Part 62, and in Devon vs. Kemp, decided May Term, 1837, and also in the case of Collins vs. Montgomery 2 Nott and McCord 392. These cases proceed upon the ground that the presence of the property and the delivery of it to the purchaser, was necessary to perfect the sale. And Judge Butler says in his opinion in the case first referred to above, "in England such an interest would be considered as nothing more than a trust in the one having the interest for life, for those in remainder;" and further, "if so it would be a mere equity, which might be assigned, but which could not be levied upon and sold under a fi. fa." That such future vested interest may be subjected to the payment of debts by proceedings in Equity, there can be no doubt.— But the question here is as to the duty of the administrator. He had no legal power to take possession of and expose to sale and actually sell and deliver personal property of which the tenant for life had a rightful and exclusive possession. Delivery is essential to perfect the sale of a chattel and such delivery was impossible in this case. We see then that a public sale of this reversion was impracticable and illegal, yet it was the duty of the administrator to have made the sale at public auction if made at all. But he disregarded his duty and sold at private sale to the only person who could have had possession—the owner of the life

estate.   In such sale there could have been no competition amongst purchasers, and little prospect of obtaining the full value.   The general question whether a private sale by an administrator would carry the title to a *bona fide* purchaser without notice, where there was no mistake, fraud or collusion, notwithstanding a statutory direction that all sales shall be public was not observed, we do not consider necessary to be discussed here.

The relation in which Cole stood to the property and the parties in interest, together with the *prima facia* inadequacy of price growing out of gross mistakes, we think sufficient to annul this sale, although it should have been made in a regular manner.   McBride, the administrator, in this transaction, was undoubtedly acting as trustee for the distributees of Murray, and according to the authority of Dargan & Bradford vs. Richardson, above cited, Cole who possessed the life estate, stood in the same relation to them.—They are now complaining in their own person against both, and should not suffer the loss of their rights by the follies and mistakes, and negligences of their trustees.   An executor may not enter into hazardous bargains, whereby he jeopardizes the interests confided to his care.   4 Muntford Rep., 332.   And a mistake which works injury, is always a ground of relief.   Now here are two parties, both standing in the relation of trustees to these minors, bargaining hazardously together, under evident and gross mistake, to the prejudice of their *cestui que trust.*   For it is manifest if they acted in good faith, (and if they did not the transaction fails,) that they supposed the erroneous value placed upon the widow's share of the four crops, was no more than the value of the reversion exchanged for and in satisfaction of it; when it appears therefore that this value was estimated materially too high, their own estimates fail to that extent of the value of the reversion.   Every one knows the vast;

and yet variable difference between the *nett* and *gross* value of the cotton crops on a plantation; some planters purchasing their supplies, while others produce them mainly at home. Nor is the value of a reversion in slaves after a life estate, less uncertain. Many circumstances may add vastly to their value, or diminish it during the continuance of the particular estate. The usual estimate of the annual increased value of a gang of slaves, we suppose to be about six per cent., and if this be true in this instance, then a purchaser who had paid the whole value of the slaves, would have received them at the termination of the life estate, with the addition of a natural annual increase of six per cent. in value, and this too, free of all charge or expense in keeping them; and this alone would have been no mean income on the investment. The facts of this case it is alledged, shows a result of this kind. But these conjectures are capaple of being reduced to proximate certainty by reference to a master.

It is suggested however, that there is an entire absence of proof as to the value of this reversion; we do not think so. It is apparent from the record that the consideration was materially less than the estimate of the parties, and to this extent at least, there was inadequacy. But if there was no light upon this subject, the rule in chancery is that the purchaser of a reversion must prove that he gave a full price. Hickman vs. Smith 3 Russ. 433 ; Davis vs. The Duke of Marlboro' 2 Swanson p. 147, 151, 2 Atkins 185, 2 Vesy 149, 155 ; Wiseman vs. Beach, 2 Vernon 121 ; Barney vs. Tison 2 Vent. 359. With how much greater force must this doctrine apply to a purchaser who stands in the relation of trustee and is in privity with the estate for which he deals. The cases go so far as to declare that age makes no difference against persons dealing for their expectancies and some of them hold the doctrine that the character of heir is not

a necessary ground of relief.  Surely the present complainants are entitled to the benefit of these principles, when both the vendor and purchaser stood in  the relation of trustees to them when they were dealing with  their expectancies. In the absence therefore of proof that the sale was fair and for a full consideration, it can never be confirmed in favor of a trustee in privity with the  estate.

We are of opinion that this  bill is well brought and the complainants entitled to relief,   That the slaves with their increase named in the deed of  settlement should be  partitioned among  all the children of Mrs. Murray, afterwards Mrs. Cole.   That the sale of the reversion of the negroes allotted to Mrs. Cole as  dower be allowed to stand only as a mortgage to secure the payment to the estate of Cole of the true nett value of Mrs. Cole's share of the four cotton crops set forth in the pleadings, and that it be referred to a master to ascertain and report such value, upon the payment of which, with interest, the said slaves shall be returned to the estate of Murray.

Let the partition  prayed for proceed in reference to  the rights of the parties thus established.

The decree is reversed and set  aside and the cause  remanded to be  proceeded in, upon principles not inconsistent with  this opinion.

BALTZELL, C. J., delivered the following dissenting opinion :

This is a suit instituted by the distributee of one estate, and the administrator of another, against infants, his own wards, to recover property, slaves, which have been in his possession as administrator, and that of their father and mother undisturbed for near fourteen years ; the claim now for the first time asserted.

The complaint is that there was a  mistake made as to the price given for them ; that this was inadequate, and

that they were actually worth more than was given for them. Whilst the allegations of the bill are of this vague, loose and indefinite character, the proof, if this were possible, is worse—in fact no proof at all. To defeat a solemn bill of sale, executed in the year 1843, in the most formal manner, in the presence of two lawyers in Monticello, with a release also formally executed, a paper is used professing to be an account of sales of somebody's cotton—*a hurried statement*, for what purpose made, whether used by any one or known to the purchaser, does not appear and is not established. Upon this paper, this loose and vague memorandum, a decree is given setting aside the title of defendants, and decreeing it to complainants. Such, in brief, is the history of the case, and the annals of jurisprudence may, in my opinion, be searched in vain for a case so barren of equity and justice, so destitute of all merit in conscience or right, so ill-sustained by either allegations or proof, so positively obnoxious and offensive to principles esteemed venerable, and to feelings near and dear to the common sentiments of humanity. I assert this after the most careful investigation of the case, the most anxious and attentive examination of the authorities.

I can scarcely credit the fact that the case has been regarded by this Court as having the slightest claim to estimation. The idea of the administrator of a father and a mother suing their children, setting up claim to property, the possession of which he holds by virtue of their title, using his official name and their means to support an adversary claim, suing infants, whose means of support and defence of their rights are in his hands, and whose age, inexperience, weakness and imbecility, constitute the most irresistible claims to his protection.

This Court, in the case of Strong vs. Willis, in strong and indignant terms, rebuked the action of a trustee asserting an individual right in opposition to his trust. They

say, "if assailed by a stranger, the duty of the trustee would be to defend and protect the property, and he would be compelled to do so. Does he occupy a more favorable position as far as his own rights are concerned? Can he who has undertaken by his own solemn act to defend this trust deed, and carry into effect its objects and purposes of express and specific character, be permitted himself to turn round, repudiate the trust, and defeat and destroy it?" 3 Florida, 133.

Infants, from the earliest ages, whenever sued, have been "treated as wards of Courts of Equity, and under its special cognizance and protection, and they regard them throughout, indeed, with all the anxious care and vigilance of a parent." 2 Story Eq., 582. Here the position is reversed, for whilst complainant and his case seem to be special favorites, they and theirs are objects of odium and distrust. In possession of personal property for near fourteen years, a period sufficient to give title to anybody else and insure protection in a court of law as well as equity, having title full and complete in all the formality of law, it gives them neither defence nor protection. Presumptions of law and of fact, hitherto available to support title, to cure irregularities and defects, are used to their injury, to impair, to defeat and destroy their rights. They would be entitled to the statute of limitation, to trial by jury, if full grown; they do not receive it as infants. The claim of a dowress has been hitherto regarded with favor in equity, and such was the position of their mother. It is here placed below all others. In case of mistake, the error usually is corrected and compensation given; here the whole bargain is rescinded and set aside. It is openly alleged, that the administrator will not be held accountable for this or any other action. The infants and children are more easily assailed—have less power of resistance.

In a moral point of view, in *foro conscientiæ*, the claim

is still more objectionable. The purchase of this property, these slaves, after the lapse of many years, proves, through the increased value of this species of property, to have been a lucky one; hence it is an object to get them, and not any deficiency of price. If there had been a loss or a bad bargain, the claim would never have been heard of. Hence an arrangement, the united act of father and mother, now in their graves, jointly with a venerated grand-father, whose integrity, whose kindness to all his grand-children is most distinctly asserted and admitted, all these are to be assailed, and be put in the position of official infidelity and wrong. He made a gross mistake, sold the property for too little, abused the confidence and trust reposed in him by usurping power not belonging to him! Independent of such considerations, it can be shown that the claim of Cole's children is sustained by the highest principles of law and equity; that their title is valid and firm as the action of their parents and grandfather is above censure and reproach, and based in the highest integrity and virtue.

Alexander Murray, of Jefferson county, having died in the year 1836, administration of his estate was committed to B. McBride, as administrator. Murray's widow intermarried with Richard B. Cole, who obtained from the Superior Court of the county, an order for the assignment of the dower of his wife in the estate of Murray, and the Commissioners allotted to him twenty-three negroes and other real and personal estate, as her portion. They also recommended that he be allowed " the third of nett proceeds of cotton made on the plantation of the estate during the years 1836, '37, '38 and '39." The Court, upon this report, ordered that " one-third of the net proceeds of the cotton crops grown on the plantation of the said Alexander Murray during the years aforesaid, be paid the petitioners by the administrator, as recommended in the report."

McBride, the administrator, on the 7th of January, 1843, sold to Cole the twenty-three negroes previously assigned as dower, in full and absolute right, in compliance with the judgment, to pay the sum due on the crops aforesaid, and another small sum. A bill of sale by McBride, transferring the complete right to the negroes, and a release by Cole in due form of the judgment and debt aforesaid, and of all claim in behalf of his wife against the estate of Murray, were executed and delivered by the parties respectively.

Cole died in the year 1848, and his widow administered on his estate. In 1852, Mrs. Cole died. Administration of both their estates was, in November, 1852, confided to Asa May. On the 25th November, 1853, he filed his bill as administrator of Cole and of Mrs. Cole, and in right of his own wife as a distributee of Murray's estate, against the infant heirs of Cole, against McBride, the administrator of Murray, and against Alvin May and his wife, who was another child of Murray. The primary and main object of the bill undoubtedly is, (though other matters are mixed up and included in it,) as its prayer expresses, " that the slaves allotted to said Caroline, and their increase, be decreed to be the property of the administrator of Murray, and that the same reverted to him on her death, and that the bill of sale made on the 7th day of January, 1843, to said Cole, be cancelled and set aside, and the property be distributed," &c.

The grounds of this application are the omission to " include the expenses of the plantation, embracing overseer's wages, provisions and supplies, medical bills, taxes, farming utensils purchased, and other expenses incident to the growing of crops, for the years 1836–7–8 and 9, as well as the expenses of the sale and transportation of the same."

Again, " that the reversionary interest of the estate in said slaves was really worth, not only more than the true

balance then due to Mrs. Cole for her interest in the crops, but largely more than the incorrect and erroneous estimate which formed the basis of the settlement," &c.

3dly. That McBride as administrator had no authority nor power to sell such reversionary interest.

In short, they may be stated to be mistake, inadequacy and want of authority.

Before examining these, as we propose to do in their or_der, it is proper to refer to objections at once manifest on the face of the bill, and conclusive against the right of re-covery. The right of an executor or administrator to the personalty of his testator or intestate, is too firmly estab-lished to be now controverted. " He is the representative of the deceased, and has the same property in his goods as the principal had when living, and the same remedies to recover them." 2 Black. Com., 511.

The Supreme Court of the United States hold the same doctrine as to an executor, (whose powers are the same as an administrator, except when a will intervenes.) "The appointment of an executor vests the whole personal es-tate in the person so appointed. He is, for the purpose of administering, as much the legal proprietor of the chattels as was the testator himself while alive." Griffith vs. Fra-zier, 8 Cranch, 9 ; Peters' Cond. Rep., 9.

And such is the language of all the American Courts, without exception.

" A distributee or legatee has no right to the property, nor is he recognized either at law or in equity until he be-comes possessed through the assent of the executor or ad-ministrator." Farley vs. Farley, 1 McCord, 514.

In Gregory vs. Forester, the Supreme Court of South Carolina say, the executor or administrator is the *only* or-gan through whom the rights of those entitled to the person-alty can be ascertained, and the law requires the formality of an administrator as necessary to the security of those

rights.  *Ibid.* 324 ; 1 Marshall, 10 ; see also Bradford vs.
Felder, 2 McCord, 170 ; 6 J. J. Marshall, 26–572 ; 13
Wendell, 453.  This Court has held the same language in
two cases decided at the present term, McHardy's Heirs
vs. McHardy's Executor, and Smith vs. Croom, affirming
the case of Lott vs. Meacham in 4 Fla. Rep., 148.

"Exceptions will be found to the general power of the
executor or administrator to dispose of the estate of the tes-
tator or intestate, in those *cases only* where collusion ex-
ists between the purchaser or mortgagee and personal rep-
resentative."  Will. on Ex., 611–612.

"There must be some fraud or collusion, or misconduct,
between the parties."  1 Story's Eq. Jur., 545.  The bill
in this case distinctly repudiates and rejects all imputation
of fraud against McBride ; indeed makes none against
Cole.  The aid rendered to the estate of Murray by the
former by the liberal advance of his own means to protect
the property from creditors, his gifts of slaves and lands to
his daughter and children, all show his warm interest in
the welfare of his child.  Nor is there an insinuation that
he preferred either of his grand-children to the other, or
desired to advance one more than the other.

Where then is the pretext for a suit on the part of this
distributee ?  The idea that he has the right to have a sale
made by the administrator cancelled on the score of mis-
take or inadequacy, to have a decree for a return of the
property to the administrator, is unheard of, and was never
before entertained by any one.  Fraud and collusion are
the grounds, and the sole grounds of interference by a dis-
tributee or creditor with the action of an executor or ad-
ministrator, and this is based entirely upon the nullity of
the act, (for in case of fraud there is in law no action, and
the fraudulent actor is displaced)—a state and condition
wholly at variance with, and opposed to the correction of
a contract for mistake, or setting it aside for inadequacy—

which admit its validity and the authority under which it was made, yet object to an irregularity in the mode of its execution.

Even if complainant succeeds in establishing his claim to the full extent, showing that there was mistake and no authority for the sale, does he not show that the slaves rightly belong to the administrator and that he alone has the right to sue for them, and that his remedy is clear and unquestionable at law, or is it come to this that a Court of Chancery is to be a sort of wet-nurse for all desperate claims, in the hope of making up deficiencies of title, of proof, and of allegations by presumptions—an expedient to get rid of the certainty, precision and security afforded to rights and property and to title, by the common law and trial by jury, and substitute in their place fiction, conjecture, presumption.

The mistake complained of is denied by the answer, and is sustained by the Court in conclusions of this kind : " The administrator was in a condition, whatever might have been his intention, to commit errors and mistakes "—" he disregarded his duty—there was gross mistake." The action of the contracting parties is denominated " follies, mistakes and negligencies"—" an executor entering into hazardous bargains to jeopardize interests confided to his care." With due respect, this does not dispose of the question at issue. A Court of Chancery has no power, no authority to determine the quality of a contract, whether it be good or bad, profitable or injurious, to an estate. Such an inquiry is wholly unsuited to the judicial mind, and foreign from its objects and the purpose of its institution. The nearest approach of any thing of the kind is to be found in the subject of inadequacy, which, properly considered, is not embraced in it, since it rather affirms that there is no contract, than that it is beneficial or injurious to either of the parties. As the jurisdiction of the Court

30

in cases of mistake forms the turning point of the case, it is proper that it be thoroughly understood. Very fortunately it is well defined, and the difficulty is rather as to the application of the rules than their proper definition.

"The general rule is, that an act done or contract made, under a mistake or ignorance of a material fact, is voidable and relievable in equity." 1 Story Eq., 155, § 140. So in cases of mutual mistake going to the essence of the contract. *Ibid.* 157, § 142. Under these two heads we have an illustration of the various points decided; thus in case of the non-existence of the thing contracted for—as to the extent of the thing sold—a release of the rights of the party to property of which he was ignorant that he had any title. § 142, 143, 145, 146. To these there are important qualifications—"that the fact constituting the mistake, is material to the act or contract; that it is essential to its character and an efficient cause of its concoction." § 141. "Nor is it sufficient in all cases that it be material, but it must be such as he could not by reasonable diligence get knowledge when he was put upon inquiry, for if by this diligence he could have obtained this knowledge, equity will not relieve him, since that would be to encourage culpable negligence." § 146. "Nor is it every case wherever a material fact is unknown or mistaken, without any default of the parties, that a Court of Equity will interpose." "The fact may be unknown to both parties, or it may be known to one and unknown to the other ; this will in many cases afford ground of relief, as where it operates as a surprise or fraud upon [the ignorant party. But in all such cases the ground of relief is not the mistake or ignorance of material facts alone, but the unconscientious advantage taken of the party by the concealment of them. And it is essential, not only that advantage be taken, but it must arise from some obligation on the party to make the discovery—not an obligation in

point of morals, but of legal duty. It must fall within some definition of fraud or surprise." § 148.

"So when the means of information are open to both parties, or where each has adequate and equal means of information, or where the fact is doubtful from its own nature." § 149, 150.

"The general rule upon which all these distinctions proceed is, that mistake or ignorance of facts is a proper subject of relief when it constitutes a material ingredient in the contract of the parties, and disappoints their intentions by a mutual error, or where it is inconsistent with good faith, and proceeds from a violation of the obligations which are imposed by law upon the conscience of either party. But where each party is equally innocent, and there is no concealment of facts which the other party has a right to know, and no surprise or imposition, the mistake or ignorance, whether mutual or unilateral, is treated as laying no foundation for equitable interference." P. 164, § 152.

"One of the most common class of cases in which relief is sought in equity on account of a mistake of facts, is that of written agreements, either executory or executed. Sometimes, by mistake, the written agreement contains less than the parties intended; sometimes it contains more, and sometimes it simply varies from their intent by expressing something different in substance from the truth of that intent." § 152.

We have inserted these at greater length than may be regarded necessary, from the fact that the ground of the decision is not stated with such definiteness as to enable us to state on which of the various heads the view of the Court is placed.

Now upon what one of these various rules is this party, the complainant in this case, entitled to relief? He alleges that a sale was made by McBride, administrator of the

estate of Murray, of certain slaves, the consideration of which is given in a writing set forth in the record, and expressed to be " in full discharge and payment of the sum of $4,878, being one-third part of the crops of the years 1836, '7, '8 and '9, allowed by a decree of the Superior Court, and in discharge of the sum of $38, and there is a full acquittance and discharge of all claims that his wife had as dower in the estate." The mistake is alleged to consist in allowing the gross expenses instead of the products of the crops of those years. Now acccording to these authorities the enquiry would be, was this contract made in ignorance or mistake as to this fact, by one or the other of these parties? Was it, or not, designed to be embraced, but excluded by omission, accident or fraud? It would be difficult to maintain either of these positions. The release recites the decree of the Court, and that the sale is made to pay a debt created by it, and that decree [directs the nett and not the gross proceeds to be paid, and the amount of the expenses, so as to attain the nett proceeds, must above all things have been known to the administrator. How then could he complain of ignorance or want of information? Not a witness shows the design to embrace these expenses, or even that there was a charge on their account.

The Court say, "everybody knows the vast and variable difference between the nett and gross value of the cotton crops on a plantation, some planters purchasing their own supplies, whilst others produce them mainly at home." Now the administrator must have known this, and whether the supplies here were purchased or were paid for out of the corn, tobacco, rice, potatoes, bacon, sugar, or other product of the plantation. If, with full knowledge that these expenses on this plantation were not so paid, but purchased abroad, in defiance of the order of the Court and of his duty, he paid the gross expenses instead of the

nett, to the injury of the estate, is this a ground of relief for setting aside the contract and returning the slaves to him? We hold not, most clearly upon the rules and principles above set forth. It would be a case of negligence which would be the loss of the administrator. But we take it there was neither omission nor mistake. The administrator did not disregard nor disobey the order of the Court; did not neglect or fail in his duty; did not take from the estate confided to him, arbitrarily and improperly, to increase the means and add to the store of another. The fair presumption is in favor of a title, not against it; in favor of the action of a sworn officer, and not against him; in favor of the integrity of a man whose conduct is not assailed, but distinctly admitted to be beyond reproach. If these supplies were purchased, there should have been proof, and there is no presumption that they were, from the absence of such proof. "Upon proof of title, every thing which is collateral to the title will be intended without proof." 2 Starkie, 687; Sibley vs. Maria, 2 Fla. 565. "Nor will a fiction of law be raised so as to operate to the detriment of any person, as in destruction of a lawful vested estate." Broome's Legal Max., 54; 3 B. and C., 317, 325.

"The law of England as well as the English law presumes against fraud, *odiosa et inhonesta non sunt in lege præsumunda et in facto quod in se habet et bonum, et malum, magis de bono, quam de malo, præsumundum est.*" 2 Starkie, 686.

Nor is it necessary to rest upon presumption in support of the action of the administrator, even if the conclusion is attained that the expenses were due. Upon the very facts presented and in the record, there is sufficient to sustain him. There is a release by Cole of all claims in right of his wife, showing that other matters were taken into the consideration of this sale and bargain. Now the sums on

account of the crops were received in 1836, '7, '8 and '9, so that the interest upon them to the payment in January, 1843, would amount to nearly $1800, making a fund of $5400, most ample and sufficient for all the expenses of the plantation for the four years, Mrs. Cole paying $1800, her third part, the estate paying the remainder and their two thirds.

The amount of the mistake is most material and important in another respect, to ascertain whether the contract should be only reformed to the extent of the error, or set aside entirely.   In the case of Ladd vs. Chaires and Tompkins, this Court decided that " where there were no *indicia* of fraud, and the misdescription goes only to part of the estate, and is of such a nature as not to prejudice the full enjoyment of the residue or the objects the purchaser had especially in making the purchase, then the Court will enforce the contract with compensation."   5 Fla., 402.

If Mrs. Cole's portion of the expenses of the plantation amount to $1800, rejecting all claims for interest, all value of the release and settlement of further claims, why not direct a payment of this sum rather than rescind the contract?   Upon what principle can so severe and arbitrary a rule be justified ?   It is well said that " relief in cases of this kind is not matter of mere discretion—of arbitrary, capricious discretion—but sound and reasonable discretion." 2 Story's Eq., 5.

The same learned author says that " in many cases recision would not be an appropriate, adequate or equitable relief.   The accident or mistake may be of a nature which does not go to the very foundation and merits of the agreement, but may only require that some amendment, addition, qualification or variation should take place to make it at once just and reasonable to be enforced."   2 Story's Eq., 6.

Admitting there was a mistake, we have seen it must be

a material one to the act or contract, essential to its character, and an efficient cause of its concoction. Now can this be said of this item of expense—a matter admitted by the Court to be doubtful and uncertain, and certainly not treated by the parties as the efficient and leading objects of the bargain—as its very foundation? If material, it entered to some extent into the consideration, and formed a part of it, and this was capable of designation. Now not a word is said in the opinion of the Court as to this, nor is there a particle of testimony to show one single item of expense on the plantation—not a single cent paid for supplies, not even a claim set up by any body for any expense—not a witness examined to this point—neither the merchant, overseer, planter nor physician;—and yet this imaginary, unascertained, undefined expense is declared so material as to affect this contract, and be the cause of its recision! Whilst the rules and principles of equity have been so guarded as to the character of the mistake, they are more definite and decided as to the proof requisite and necessary to establish it. This very Court itself has gone to the very extreme of strictness in this respect in the case of Simpson and Barnard, Adams & Co., a case asserting illegality and fraud in the consideration of a sealed instrument. The Court held " the introduction of the subscribing witnesses indispensable to open the door to the introduction of circumstantial evidence." They held, too, that " in a matter of proof, a Court *must not conjecture*." 5 Fla., 540. The decision seems to be the very opposite, in all its aspects, to the case now decided. Without maintaining this rigor, it will be found that the English and American Courts, on this subject of mistake, hold rules and principles alike accordant with right and sense and propriety. " In all such cases, (alluding to mistakes in written agreements,) if the mistake is clearly made out by *proofs entirely satisfactory*, equity will *reform the contract* so as to *make it conforma-*

*ble to the precise intent of the parties.* But if the proofs are *doubtful and unsatisfactory,* and the *mistake not entirely made plain,* equity will withhold relief upon the ground that the written paper ought to be treated as a full and correct expression of the intent, until the contrary is established *beyond reasonable controversy.*" 1 Story's Eq., § 152. "And this remark," says the learned author, "naturally conducts us back again to the qualification of the doctrine which is insisted upon by courts of equity. Relief will be granted in cases of written instruments *only* where there is *a plain mistake clearly made out by satis- factory proofs. The qualification is most material,* since it cannot fail to operate as a *weighty caution* upon all judges, and it *forbids* relief whenever the evidence is loose, equivocal, contradictory, or in its texture open to doubt or opposing presumptions." § 157.

"There is less difficulty in reforming these, where the mistake is mainly or wholly made out by other preliminary instruments or memorandums of the agreement;—thus marriage settlements are often reformed and varied so as to conform to the previous articles, and conveyances of real estate are in like manner controllable by the terms of the prior written contract, and memorandums of a less formal character are admissible for the same purpose. But in all such cases it must be plainly made out that the parties meant, in their final arrangements, merely to carry into effect the arrangements designated in the prior contract or articles. For as the parties are at liberty to vary the original agreement, if the circumstances of the case lead to the supposition that a new intent has supervened, there can be no just claim for the relief upon the ground of mistake. The very circumstance that the final instrument of conveyance or settlement differs from the preliminary contract, affords of itself some presumption of an intentional change of purpose or agreement, unless there is some reci-

tal of it or some other attendant circumstance which demonstrates that it was merely in pursuance of the original contract.   It is upon a similar ground that courts of equity as well as courts of law act in holding that where there is a written contract, all antecedent propositions, negotiations and parol interlocutions on the same subject, are to be deemed merged in such contract."   P. 137, § 160.

The Supreme Court of Mississippi say the proof should be clear beyond a doubt.   2 How., 701.

In the case of Lyman vs. The United Insurance Co., Chancellor Kent treats the subject in his usual clear, lucid and conclusive style, and, what is more, his remarks are pertinent to the present case.   "The difficulty in this case," says he, "arises from the want of the requisite evidence of any agreement of the parties different from that contained in the policy.   The cases which treat of this head of equity, jurisdiction, require the mistake to be made out in the most clear and decided manner, and to the entire satisfaction of the Court.   The only circumstance on which the plaintiffs place any reliance to show that the Company had agreed to the proposals, etc., is the memorandum at the foot of the plaintiff's proposal.   But it appears to me that this note is far too vague and uncertain to justify any correction of the policy.   It was not *subscribed by the Company* nor by their authority.   It appears only to be heads of conversation and inquiry on mere fugitive points, which were lost and merged in the execution of the formal instrument.   It was the duty of the plaintiff to have resorted to that instrument so soon as it was drawn, to see whether the parties understood each other. No one says that the notes at the foot of the proposals were the terms, nor for what purpose they were made. All this is left to conjecture and inference.   To alter a clear written contract of the parties, without any parol proof to warrant the new agreement, and when the charge of mis-

31

take is denied in the answer and denied by a witness pres-
ent, and to do this upon no other foundation than such an
imperfect memorandum, *obscuris vera involvens,* would be
destructive to the certainty and safety of written contracts.
There is no case that goes to such lengths ; no amendment
was ever made *without absolute conviction of the truth
and precision of the real agreement.*" 2 John. Chy.,
633 and 634.

Now applying these rules to the case under considera-
tion, and there is a difficulty wholly insurmountable. There
is no proof supporting or creating the idea of mistake,
much less establishing the extent of it.   The complainant
seems to have contented himself with attempting to show
the gross receipts of the sales of cotton, as if every thing
else were consequent upon this, as if presumption would
make up whatever else was wanting; not a witness exam-
ined to prove a single allegation; no ignorance, surprise,
or want of knowledge, mistake or error on the part of
McBride, no fraud, imposition, improper conduct or advan-
tage on the part of Cole, no deficiency in any of the
agreements between the parties.   So far from the proof
amounting to absolute conviction and precision, so far
from its being satisfactory, the very opposite of all this
prevails as to the entire case, and every part of it.   It is
not a case of doubt or uncertainty ; it is a case in which
there is nothing to hang a loop apon, and utterly destitute
of all color of proof.

We have said there was an attempt to show the gross
sales of cotton.   The Court give to the paper, copied into
the record, containing an account of the sales of *some-
body's cotton,* the weight of evidence.   It is no little sur-
prising that it should have been proposed, much less treat-
ed as evidence.   It has no date, no signature, is not proved
to be the hand-writing of any one, is not connected with
any proceeding, judicial or other, to give it authenticity—

was not even read as evidence in the Court below.  It was *exhibited* to the .Court below—the appropriate expression to characterize the only legal use of such a thing. It is assumed to be McBride's hand-writing.  Now McBride is a party, and his deposition or statement of the entire transaction, under oath, would not be evidence except against himself.  If the paper was made before the bill of sale and release, these supercede it, and give the true history of the transaction.  They are the deliberate act of both parties, whilst this of McBride's is, by its own acknowledgment, a *hurried* statement in the absence of papers, and entitled to no credence.  If made afterwards, McBride could neither do nor say anything to invalidate his own title.  The Court say, "if good to charge Murray's estate, it is to discharge it."  Now there is nothing to support any such allegation.  The fact is the paper cannot be regarded as evidence except by an overthrow of the rules and laws of evidence.

Before noticing the second point, some attention is due to objections made to the report of the Commissioners and the judgment of the Court, which are declared to be a nullity—the former as not having been confirmed, and further, the widow, it is said, was only entitled to her portion of the personalty of which her husband " died possessed." Now a very conclusive answer to all this is, that none of these were contested or put in issue by the pleadings.  So far from it, their validity is expressly asserted by the bill. What else can we infer from the allegation, that " in the execution of the decree confirming the report of the Commissioners, the administrator made a mistake in the adjustment of the amount of said proceeds," &c. ?

In St. Andrews May Exra &c. vs. Chinn &c. this Court held, as they had previously on various occasions, the doctrine, familiar to every lawyer, that " no facts are properly in issue unless charged in the bill, and

of course no proof can generally be offered of facts not in the bill, nor can relief be granted in matters not charged, although they may be apparent from other parts of the pleadings and evidence." They would not admit the case made out by the answer, even to vary the case. 5 Fla. 565.

Independent of this, a judgment may not be reviewed in this Court except by appeal or writ of error, and whilst so unreversed it concludes the subject on which it is rendered, and pronounces the law of the case. It puts an end to all inquiries into the fact by deciding it. 3 Peters, 204–5; 10 Peters' S. C. Rep., 479; 2 How. S. C. Rep., 343 ; Florida, Stephens vs. Sessions.

But it is wholly indifferent as to this point, as the declaration of the nullity of these affects not in the slightest degree the title of defendants. This rests upon their bill of sale, and their possession of near fourteen years, undisturbed and unquestioned. On the contrary, it leaves the case of complainants without a shadow of support, for it is the deviation from the order of the Court in paying the gross proceeds instead of the nett that forms their entire case, and this is made out alone by the judgment and order of the commissioners.

So erroneous do I regard the views on the point of the interest of the widow, that I cannot consent to allow them to pass unquestioned. The statute does not require the report of the commissioners to be confirmed. It directs the sheriff to " allot and set off to the widow her portion of the personal estate, *which part shall be and* enure to such widow, her heirs," &c. Duval, 87. This of itself constitutes her title. Nor is she confined to the personalty of which her husband " *died possessed.*" This is very far from being the law, and the quotation is but a fragment of it.— The statute enacts that " on a petition being filed, the Court shall issue their writ to the sheriff, commanding him to summon five discreet free holders as commissioners,"

who, after allotting one third of the land, "shall at the same time allot and set off to such widow her portion of the personal estate of which her husband died possessed, *and to which by this law she shall be entitled*," sec. 3.— The second section of the same law referred to provides that " the widow shall be entitled to a share in the personal estate ; if there be more than one child, (the case of Mrs. Cole,) to one third part in fee simple, except slaves, in which she shall have a life estate, and such claim shall have a preference over all others.", Duval, 86.

She was then entitled to the proceeds of the crops, and to whatever in addition was made by the estate up to the time of the division or allotment.

Other positions, subject to the objections already taken of the want of allegation in the bill, of issue made in the Court below, and of testimony to support them, require notice. Thus we are told in the opinion that " Cole was a trustee of Murray's estate, and the minors of Murray should not suffer the loss of their rights by the follies, mistakes and negligencies of their trustees, Cole and McBride, &c. Cole was in privity with the estate for which he was dealing."

The object of all this undoubtedly is, to deprive Cole and his representatives of the rights, which, by the rules and principles of equity, are extended to a *bona fide* purchaser, to affect them with notice of every thing connected with the estate, so that if there be mistake, and the act not perfectly legal and exactly formal, to make it void, to incapacitate them from purchasing, for no principle is better settled than that a trustee cannot be both vendor and vendee—buyer and seller ; further, even this, that a title procured by them shall not have the protection of the statute of limitation. Beyond this, even that the dowress when treating with the estate of her deceased husband, shall occupy the position of, and be subject to the rules prevailing

in cases of fraudulent purchasers in collusion with an executor. Now the objection and answer to this is, that it is not only not supported by law, precedent or authority, by equitable rule or principle, but directly opposed to them all. In point of fact, Cole was not trustee. Where is the evidence of this? Who made him or the dowress trustee for the children of Murray? What charge had they of the property—what power over it? McBride was the owner and holder, and if any body was trustee he was, but his trust was not jointly with Cole. So far from the owner of the dower interest being regarded as an object of odium and ranked with a fraudulent purchaser, and prevented from buying from the estate, the very reverse exists. Thus by statute, " her claim has preference over all others."— In equity she is highly favored ; her right is not only a legal right, but it is *a moral right. She is therefore in the care of the law, and a favorite of the law.* If she has recovered her dower against the heir, who is an infant, and there is a term to protect the inheritance, which by the neglect of the guardian is not pleaded, the term will not be allowed in equity to be set up against her. 1 Story's Equity, 584.

The second allegation of the bill is that of inadequacy. This subject has been so fully treated by this Court in full accordance with the English and American decisions, and its application is so forcible to this very case, that little more is requisite than to repeat what is thus declared.— In Barrow vs. Bailey it was held " that to justify relief of this character, there must be unconscionableness or inadequacy, so as to demonstrate some gross imposition, or some undue influence, such as *would shock the conscience,* and amount in itself to conclusive evidence of fraud." 5 Fla. 27 ; 1 Story's Equity, § 244, 246.

In the more recent case of White vs. Walker, the Court quote from the very able opinion in the much contested

case of Farnham vs. Brooks, 9 Pickering, 231, argued by the late Daniel Webster and William Wirt on opposite sides, in which the enlightened Court say, "some principles may be extracted from the decisions which stand not contradicted by others, and therefore may be adopted as rules. One is, that mere inadequacy in price, if the bargain is fair, is no ground for relief. Another, that if the value of the thing sold depends upon a *contingency*, although great advantage may be gained,˙ yet the contract shall be sustained." 5 Fla., 487.

This last principle is fatal to this position of plaintiff, even if inadequacy were made out. But let us examine the facts, though very few and imperfect in the record— for proof there is none to satisfy the mind as to the value of the slaves, nor Mrs. Cole's life estate, nor the interest after her death.

The estimate of the Commissioners who assigned Mrs. Cole's dower is in the record, and they give the value of all the slaves of the estate of Murray in 1840. Those sold to Cole are estimated at $6140 as their full value. Add to this 6 per cent. interest, the increase according to the view of the Court, and we have $7225, the full value of the negroes in January, 1843, the time of sale. Now it was not the full right which McBride was selling, but only the interest after Mrs. Cole's death, and this value is the matter of enquiry. She was, judging from a deed of trust made to her before her marriage, probably thirty years of age in 1843, and her chances of life might reasonably have been estimated at thirty years more, but say twenty, so as to allow for mistakes. What would then be the present worth of negroes in the market, burthened with the use and enjoyment of them by another for twenty years, taking all risks of death, injury, &c.? Is it one-third, one-half, or two-thirds of their full value? To state it differently, what is the worth of a life-estate in negroes, with a prospect of en-

joyment for twenty years?—for this should be deducted from the full value to get the worth of the reversion. Would one having the future interest, or a third party having no interest, give one-third, one-half, or two-thirds of the value, in the hope of realizing at some future period?

The administrator sold this uncertain interest, dependent upon Mrs. Cole's death, with a fair prospect of her living twenty years, for upwards of two-thirds of their full estimated value, throwing out of view the claim for interest for monies received by the administrator in 1836, '7, '8 and '9, the value of the release of further claim on the estate, giving $4926 for negroes estimated at $7225. And this is adjudged inadequacy—a bargain to shock the moral sense, as conclusive evidence of fraud, as demonstrating some gross imposition or undue influence.

A rule of the English law, as to the purchase of reversions, has been applied to the case—a subject more largely treated by Judge Story. Having stated the cases of constructive fraud in which the contract is a fraud upon the rights, interests, duties, etc., of third persons, he says: "it is upon this ground that relief has been constantly granted in what are called catching bargains with heirs, reversioners and expectants in the life of their parents, or other ancestors. Many, and indeed most of the cases, have been compounded of every species of fraud, etc. There is always fraud presumed or inferred from the circumstances or conditions of the parties contracting, from weakness on one side, usury on the other, or extortion or advantage taken of that weakness. In most of these cases have concurred deceit and illusion on other persons not privy to the fraudulent agreement. The father, ancestor or relation from whom was the expectation of the estate, has been kept in the dark. The heir or expectant has been kept from disclosing his circumstances, and resorting to them for advice, which might have tended to his relief and also

reformation. This misleads the ancestor, who has been seduced to leave his estate, not to his heir or family, but to a set of artful persons who have divided the spoil beforehand." 1 Story's Eq. 357, § 334.

If the entire books had been searched for authority, none could have been found more inapplicable to the case under consideration. If Murray's children, the distributees of this property, the reversioners or expectants, after the death of their mother, had been seduced by her or her husband Cole—if advantage had been taken of their necessities, weakness or ignorance, through usury, extortion or other means, to. purchase their interest at an unconscionable price, then the authorities cited by the Court might have application. But can this sale by McBride, a full grown man, the officer confided by law with the ownership of the property and its disposition, be termed a catching bargain ? Can weakness, youth, imprudence, giddiness, necessities and pecuniary embarrassment, ignorance and incapacity be imputed to him, so as to cause a contract made by him to be set aside, as if he were a minor and infant? Can calculating rapacity, artfulness, usury and extortion be alleged as to Cole? It may be a question whether the rule has any application in this country, being rather based upon the great desire of the English Courts to protect the interests of their peculiar classes than upon any principles of right or justice. Apply it with all its force to the present case, that the purchaser of a rever. sion must prove that a full price was given, and.the proof in this case is ample, full and complete.

Another conclusion of the Court is, that the sale was not public, but made privately. No such fact is alleged in the bill put in issue by the pleadings, nor made to appear by the proof. The bill alleges want of authority, of power [in the administrator to sell—alleges mistake and inadequacy as the special grounds. This evidently is em-

32

braced by none of these, indeed is excluded by them.—
That it should be set up by the Court here for the first
time, not having been made a subject of contestation in
the Court below—should be held of such moment as to
conclude the rights of the parties, is incomprehensible—
nay more, to raise such an issue—to come to such a con-
clusion with the facts of this case before them !

This suit is by the complainant as administrator of Mr.
and Mrs. Cole, charged by law and his oath with the rights
and interests of their children in this very property, and
trusted with the muniments of their title to all their prop-
erty. The proof is entirely on his side, not a particle on
theirs. Not even the title deed, the bill of sale made by
their grand-father to their father, under which the property
has been held by their father, by their mother, and by May
himself as their administrator, giving the history of the
bargain, the account of the transaction—even this is not
filed, and their rights are tried in its absence, and this
most unfavorable presumption to their prejudice and inju-
ry indulged with full knowledge of its existence, but in ig-
norance of its contents. The release filed by the complain-
ant to show the mistake, shows that there was a bill of
sale. "Be it remembered, that I, Richard B. Cole, have
this day received from Burwell McBride, administrator of
the estate of Alexander Murray, a *bill of sale* of the right,
title and reversion in the following negroes," &c. Now
why file the release and suppress and withhold this instru-
ment ? Whilst this important document is thus kept out
of view, whilst the account of the administrator is also kept
out of the way, a fugitive vagrant scrap of paper is hunted
up to supply their place ! It is thus the rights of these in-
fants are disposed of—in this manner their title is tried and
presumed to be bad !

The finding that the sale was private, is based upon a
statement that it was not contested in argument. Such

view is utterly opposed to the views of this Court in Simpson vs. Barnard, Adams & Co., and to other authorities, showing conclusively that no one has a right to admit away the rights of infants. "Where relief is sought against infants, the facts upon which it is to be founded must be proved; no decree can be made upon admissions in the answer of a guardian *ad litem*." 1 Sanf. Chy. 103, 129.

"The answer in such case is regarded as pleading merely, and cannot be used as evidence for or against the infant, against whom the complainant must prove his case." Thayer vs. Lane, Walk. Chy. 200.

Opposed, too, to views of the jurisdiction of this Court, taken again and again from its first organization. "The jurisdiction of this Court is appellate merely, to re-examine and re-judge, to correct erroneous decisions already made. It is not a jurisdiction to determine, in the first instance, cases or questions which have not been submitted to the decision of the Court below." Archer vs. Duval, 1 Fla., 225.

The Supreme Court of the U. S. express themselves more pointedly to the same effect. "This objection was not made in the Court below at the hearing, or in the argument, so that no opportunity was afforded to the petitioner to produce any evidence on the subject, or his counsel to answer the objection. Under such circumstances, it would be dealing a measure of justice incompatible with every principle of equity to visit upon him an objection which he was not bound to meet in the Court below, which he could not meet there, and which the Court were compelled to refuse him the means of removing by evidence." Mitchell vs. U. S., 9 Peters, 31.

We come now to the third position—the power of the administrator to sell a reversionary interest. It is admitted by the Court, that "according to the English authorities, a reversion is assets in the hands of the administra-

tor, coupled with an interest in himself, and like all other assets of the estate, it was in his power to dispose of it at private sale." No limitation has been shown to the power and authority of this officer to dispose of the personalty, and if he can dispose of a full interest in slaves, which has been conceded, where is the objection to his selling a minor and inferior interest? There is no better chance of fraud (which seems to be the main argument,) in the one case than in the other. If an interest in remainder or reversion, contingent or conditional, be required for payment of debts, why may it not be sold now at its present value, in its present state? Why wait twenty years or more, taking all the risks of death or other accident, to sell the same property at a future time, to pay the same debts? Besides, where is the direction to the administrator to suspend his functions and cease from paying debts? Such impediments to the sale of personal property are injurious to the public, to the present and future owners and to creditors. They are alike opposed to the express obligations and duty of the administrator, who is enjoined by law to sell property, both real and personal, until the debts and legacies are all paid. The authorities and rules on the subject in the English Courts and in text books, are uniform, and, without exception, maintain both the right and power. It is proper to bear in mind that the same rules apply to executors as to administrators, except where a will may direct the action of the former. Williams on Ex., 601.

"All goods and chattels, real and personal, go to the executor." "Chattels in action as well in possession, go to him." 2 Com. Dig., 281.

"There are two sorts of choses in action; one, which may be called a present chose in action, and another, which is called a future or reversionary chose in action. Among future choses in action, reversionary and contingent, may be enumerated a reversionary interest in money or stock,

expectant on a precedent life estate limited of it." Ram. on Assets, 176. "Executors and administrators are entitled to interest by condition, remainder or increase, by assignment, limitation and election." Toller on Ex., 164; Williams, 440.

"Reversion expectant upon an estate for life, or term of years, shall be assets." 1 Com. Dig., 579.

"A remainder in a term of years, though it never vested in the testator's possession, and though it continue in remainder, shall go to the executor and be assets." Toller, 166.

If such interest be assets, the right of disposition cannot be disputed. "It is a general rule of law and equity that an administrator has an absolute power of disposition over the whole personal effects of his testator or intestate." 2 Will. 609.

"It is a general rule of the Court of Equity, that where personal property is bequeathed for life with remainder over, and not specifically, it is to be converted into government stock, and the tenant for life is entitled on that prin ciple." 7 Vesey, 137.

"Where there is a general bequest of a residue for life, with remainder over, the practice now is to have the property sold and converted into money, and the proceeds safely invested, and the interest thereof paid to the legatee for life." 2 Kent, 354; 8 Paige, 295.

"The rule as to personal estate is, that what is not specifically given, and consists of an interest wearing out, or an interest at present saleable, but in point of enjoyment future, the whole is converted into money, in a question between tenant for life and remainderman." 9 Vesey, 552.

Whilst the right to sell the reversion is thus manifest, placed beyond the possibility of a question, and directly admitted by the Court, the sale made in this case is adjudged bad because of the illegality of a sale made pri.

vately and not in public, and because of inadequacy and gross mistake. This has already been adverted to as to the matter of fact, and I propose now to consider it in connection with the law of the State, with statutory provisions. Is there anything altering the common law on this subject so as to make a private sale necessary, or prohibiting such a one on the part of the administrator? It is first provided that "slaves shall be deemed, held and taken as personal property, for every purpose whatever." This, by statute as early as 1823, sections nineteen and twenty of the law concerning wills and the duties of executors, passed in 1828, apply to the subject. These provide that executors and administrators, whether it be necessary for payment of debts or not, shall, so soon as convenient after they shall be qualified, sell at public sale all such goods of their testator or intestate, specific legacies excepted, as are liable to perish, be consumed, or rendered worse by keeping, giving such credit as they shall judge best and the circumstances of the estate will admit, taking bonds or promissory notes, with good security of the purchasers, and shall account for such goods according to the sales," etc. § 19.

"That if such perishable goods be not sufficient for the payment of debts and expenses, the executor and administrator shall proceed to sell the other personal estate, disposing of the slaves last, until the debts and legacies be all paid, having regard to the specific legacies, provided that if any testator direct that his estate shall not be appraised or sold, the same shall be preserved in specie, and an inventory only be made thereof and deposited, unless a sale be necessary for payment of debts." § 20; Duval, 173; Thompson, 202.

There is in the first of these sections a direction to sell perishable goods at public sale, but it is not continued in the second clause. The terms are, that they "shall pro-

ceed to sell," omitting the words of the first section, "at public sale." Now if a provision of this kind was designed to be so express and peremptory as to invalidate a sale, it is inconceivable how such an omission was made or took place. To give this force to a clause of the kind would be to violate the plainest rules of reason and common sense, and subvert the plainest dictates of propriety. To hold that the omission of a direction is not only tantamount to a positive direction, but beyond it, of so express and peremptory a nature, as to repeal an absolute law on the subject, would be going to an extreme; the more so when by decision of the Court at its present term, affirming the rules of construction of the English and American Courts, it is held that "to repeal a statute or the common law, there must be negative terms or words so clearly repugnant as necessarily to imply a negative, repeal not being favored by implication, and it is not to be presumed that the Legislature intended an innovation beyond what the case absolutely required." 1 Black., 90; Dwarris on Statutes, 695; Mitchell vs. Stewart.

Admitting that the terms "at public sale" are continued into the second section by implication, so as to give a direction to the executor or administrator thus to sell personalty, what is to be the effect of the non-observance of such order? There is a manifest distinction, familiar to the lawyer as to the judge, in construing statutes between acts merely directory, that ought properly to be attended to by the officer, and yet do not invalidate through non-observance, and such as are vital and indispensable to the validity of the act to be performed. Negative words, affirmative words that are absolute, explicit and peremptory, and show that no discretion was intended to be given, and such as are of the essence, seem to be of the latter character; others are not. 8 B. & C., 29; 2 Dwarris on Stat., 714, '15 and '16; Frazier vs. Willy, 2 Florida, 118; Wil-

liams vs. Mosely, 2 Florida, 334; Smith's Com. Cons., 782, 795.

A case decided by the Court of Appeals of Kentucky, will illustrate this doctrine. Objection was made that a sheriff's sale was had without advertising at the meeting-house door and most public places within the county, as required by law. The Court say the "law is silent with respect to the consequence of a failure on the part of the sheriff to comply with its requisitions, nor is there any statutory provisions on this subject. It is obvious that in the several acts prescribing the duties of sheriffs with relation to executions, there are many provisions which are merely directory to the sheriff, and a failure to comply with which, thought it might render him liable to the extent of the injury produced by such failure, would not vitiate the sale under execution. Thus, for example, the law requires that the sheriff shall endorse on the execution the time when it came to his hands, yet no one will contend that a sale made under an execution, where the sheriff fails to make such endorsement, would be void on that account. Other examples of a similar nature might be given, but they will readily occur to those who will take the trouble to reflect on the subject." They held the provisions directory, and overruled the objection to the sale. 2 Bibb, 402.

In a more recent case, the same Court held that an irregularity or defect in the advertisement, nor the inadequacy of the price, nor place of sale, nor paucity of bidders, did not invalidate the sale. Kilby vs. Haggin, 3 J. J. M., 212.

And these decisions are believed to be in exact accord with those of all the American Courts. Their correctness will be perceived by a careful consideration of the two sections above quoted. They provide, the 19th section, that the perishable goods be sold at public sale, whether necessary to pay debts or not, giving credit and taking bonds

and notes with security. The 20th, if there are not suffi-
cient to pay debts and expenses, then the other personal
estate to be sold, and slaves last. Now if the strict rule is
to be applied to the mode of sale which is presumed to be
given in the latter section, very obviously it embraces the
other express provisions—that the perishable goods be sold
first—that they be sold on credit, for bonds with security
—that the personalty be sold after these, and only for pay-
ment of debts, and slaves after all the rest is sold. Now
under this new rule, if any of the directions here given is
not observed, if perishable property is sold after the other,
or if security is not taken—if there are no debts, or slaves
not sold last, or any of the property is sold for cash, the
sale is void. Nor are these the only directions important
to be observed. The whole statute is full of directions, not
less important, imperative and peremptory to these officers.
Thus they are to take oath, to give bond with security, to
have an inventory, to file a complete account of property
sold, &c., so that if sales are declared void for one failure
they may be for all; and if the objection is available to
the estate, it may be for a purchaser who may assert his
right in reply to the note or by suit. Strictly carried out,
no rule would be more disastrous—injurious alike to the
estates of decedents and to all persons deriving title from
them; for it may be safe to affirm, that scarcely a pur-
chase made at an administrator's sale within twenty years
past would stand the application of such a test. The fact
is, that such objections have been made again and again
in the Courts and overruled. But there is not the slightest
pretext for it. The two clauses of our statute are taken,
word for word, from a statute of the State of Kentucky—
(see Littell & Swigert's Statutes of Kentucky, p. 30)—un-
der which decisions have been had to the following effect:
In Stamps vs. Beatty, the objection was that it was not
shown that a sale of a negro belonging to the estate was

33

necessary to pay debts. The Court say, "power being given to the executor to sell for the payment of debts, and in defect of other assets, it is not the duty of the purchaser to inquire into the whole administration to see whether there is a defect of other assets. He has a right to presume that the executor had rightful authority to sell. To impose such trouble, risk and inconvenience on a purchaser, would operate to the total annihilation of the power of the executor to sell in any event, and operate to the prostration of the rights of the heir in any sale that might take place." They held the sale valid. Hardin, 341.

In the more recent case of Ward vs. Lewis : "The only question in this case is, whether a sale, by an administrator, of a slave of the intestate, in his possession as administrator, for a debt due by himself to the purchaser, when the sale was not necessary for payment of the debts of the intestate, be void or not. The legal title vested in the administrator for payment of the debts of the intestate. A sale of any of them was a breach of his official duty, unless necessary for payment of debts. But the purchaser cannot be presumed to know the condition of the estate of the intestate, and therefore if he buy a slave *bona fide* of the administrator, proof that the sale was not necessary for payment of debts will not affect his right. Such a contract is not void unless the purchaser be guilty of a fraud on the estate of the intestate in making the purchase." 3 J. J. M., 505.

In another case, the same Court say, "the situation of an administrator is not like that of a trustee empowered to sell. He may no doubt sell when necessary for payment of debts, but without selling, in some cases, he may acquire the exclusive right to a chattel belonging to the estate. Where, without having any money of the intestate, he pays debts with his own money, he is entitled to the absolute property in a specific chattel of equal value to the debts paid,

by electing to take the chattel as a compensation." Again:
so that the value of the property is obtained, a sale of
slaves cannot be complained of by distributees.   Haddix's
heirs vs. Haddix's ad'r, 5 Litt., 201; 1 Munroe, 251; Tol-
ler Ex. 238; 6 J. J. M., 387.

In Henning vs. Conner, they held " an admistrator lia-
ble to distributees for the value of a negro and his hire,
*sold without necessity for the payment of debts.*"   2 Bibb,
188.

What makes these decisions more cogent still, is the fact
that slaves are there declared to be realty, and this was in-
sisted on as the ground of support to the objections taken.

The decisions of the Courts of the States from which
the provisions of our statute were borrowed, like those of
the English Courts on English statutes continued in our
system, would seem to be conclusive.   Still more so when
they accord with the views of the Courts in England, with
those of other American Courts, and of writers on law on
the same subject.

In Farr vs. Newman, discussed and considered with great
care, one of the Judges said : " I do not mean to contro-
vert that an executor has necessarily incident to his office,
a disposing power over the personal estate.   If it were
otherwise, no man would deal with an executor, for the
buyer cannot be supposed to have a knowledge of the state
of the testator's property and debts, and therefore the bare
act of sale is a sufficient indemnity to the purchaser, if
there be no collusion."   4 T. R., 644.

"It is of great consequence," said a very able Chancel-
lor, "that no rule [shall be laid down  which may impede
executors in their administration, or render the disposition
of their testator's effects unsafe or uncertain to the pur-
chaser; his title is complete and perfect by sale and de-
livery.   What becomes of the price is no concern of the
purchaser."   14 Vesey, 361.

The late Chancellor Kent, in a very elaborate and masterly opinion, after reviewing all the cases bearing on the subject of sales by executors, said, "they all agree in this, that the purchaser is safe if he is no party to any fraud by the executor, and has no knowledge or proof that the executor intended to misapply the proceeds, or was in fact by the very transaction misapplying them to his own private debt." Field vs. Sheffelin, 7 John. Chy., 161.

Judge Story says : " At common law, the executor or administrator is treated for many purposes as the owner of the assets, and has a power to alien and dispose of them. There is no such thing known as the assets in the hands of the executor being debtor; or creditor, having *a lien upon them;* but the person of the executor in respect to the assets is treated as debtor. The courts of equity do not supersede the principles of law upon the same subject, and therefore a sale *bona fide*, made for a valuable consideration, even with notice of other assets, will be held valid, so that they cannot be followed by creditors or others into the hands of a purchaser. In this respect there is a manifest difference between cases of ordinary trusts, where notice takes away the protection of a *bona fide* purchase from the party, and this peculiar sort of a trust mixed up in some degree with general ownership. To effect a sale or other transactions of an executor attempting to bind the assets so as to let in the claims of creditors or others who are principally interested, there must be some fraud or collusion or misconduct between the parties." 1 Story's Eq., 545. Again: "as the personal estate is liable for the payment of the debts generally, the purchaser of the whole or any part of it is not, upon the principle already stated, bound to see that the purchase money is applied by the executor to the discharge of the debts. Otherwise it would be indispensable for a person desiring to purchase, to come into a Court of Equity to have an account taken

of the assets of the debts due him and whether it was necessary to sell, which would be a most serious inconvenience and greatly retard the due settlement of estates." 2 Story's Eq., 382–'5.

Even in the case of trusts, admitting McBride to be a trustee of the estate of Murray, for the payment of debts generally, the same doctrine applies; the purchaser is not bound to see to the application of the purchase money. Will. on Per. Property, 233;  5 Ired. Eq., 357;  13 S. & R., 262.

That it was not an oversight in the Legislature, but that they acted with a full knowledge both of the common law and the Kentucky decisions, is evident from the fact that by the sixty-first section of the same law, they make the administrator apply to the County Court for leave to sell the personalty in case of necessity to pay debts, and require a satisfactory showing to justify the order.   Duval, p. 183.

Different States of the Union have provisions altering the law in this respect, but it will be found to have been done by language express, decided and peremptory.   Thus in Georgia: "no administrator shall be allowed to sell any slave, where the other personal estate, with the hire of such slave for twelve months, shall be sufficient to discharge the debts, and the Judge of Ordinary shall direct the sale and notice given to each distributee."   Prince Dig. 165.

In North Carolina, sales are made under an order of the Court of the county, after advertisement, and a sale is prohibited under penalty of $200.

In Mississippi the sale shall be void unless by the order of the Ordinary.

In Alabama and South Carolina on a like order.  6 Stat. S. Car., 238;  Ala. Code, 349.

Can there be a rational doubt that our Legislature would have adopted some such law as these if their design had

been to alter the law as it had previously existed, this being the rational and appropriate mode and means of attaining such an end?

The conclusion then is fair and just, that the sections quoted do not alter or repeal the common law, and that a sale privately made is not void unless there is fraud or collusion.

It remains to notice the authorities adduced by the Court in support of some of the positions assumed. They say, according "to the English authorities, a reversion is assets in the hands of the administrator, coupled with an interest in himself, and like all other assets of the estate, it was in his power to dispose of it at private sale and to confer on the purchaser a good title, though he still remained liable for any fraud or collusion in the sale. This interest, which is attended with such important consequences in the cases above referred to, is declared to be expressly done away with by our statute." Allusion is made in these remarks to the case of LeBaron vs. Fauntleroy, 2 Florida, 294.

With due respect, there is not the slightest foundation for the assertion. The Court in that case had not the subject of reversion under consideration. The remarks quoted apply to an executor and not to an administrator, and distinguish between the two. They were in reference to a subject entirely different and unconnected with this, and furnish no support to the position assumed by the Court. By the common law, the executor was entitled to the surplus remaining after debts, legacies, &c. This the Court declared was done away with by our statute, and not the power of the administrator to sell or dispose of the property.

It is said that the Supreme Court in South Carolina has decided that in interest in reversion cannot be sold under execution by a sheriff. Admit this, and it does not meet this case. The very authority shows that such interest

may be "*assigned*, but not levied upon." By whom assigned?—certainly by the executor or administrator, so that this is authority for the transfer and not against it.

Again it is said, "delivery was necessary, and no delivery was possible in this case." Can it be the design to say that there can be no sale of an interest in reversion in personalty to the present holder as by a reversioner to the tenant for life? Why he is the very one to whom the delivery was possible, and to whom the objection of want of power to deliver possession does not apply. Cole had the property in possession. By assigning to him the interest in reversion, to connect with the life estate of his wife, he acquired the full title. The books are full of such cases; indeed the Court by their decree assert this power of the administrator, for they decide that this claim of Cole's heirs shall stand as a mortgage upon the negroes and be paid with interest, and the slaves not to be delivered up until after payment. Now this is making a mortgage of the reversion for the administrator by the Court, on the principle of ordering that to be done which ought to be done.—Now if he can mortgage, why not sell?

The fact is that the common law provides the just and appropriate remedy for all this. If property is sold at an undervalue at private sale, the executor or administrator is responsible for the difference to all interested; and this is the true point of enquiry for a sale, whether public or private—is the means of getting a price and of paying debts, and if this is attained, no injury is done. In like manner he is prohibited from applying the assets to payment of his own debts, selling them collusively at an undervalue, paying debts out of their order, and all other acts showing negligence, mal-administration, so as to defeat the rights of creditors, legatees or persons entitled to distribution. For any or all of these he is liable on his bond, may

be displaced from his office, and may be enjoined by a Court of Chancery. Toller on Ex., 424; Will., 1105, 1118.

Although of the opinion that a sale by an administrator or executor is most appropriately made publicly, I see nothing in the statute to make it imperative or obligatory—certainly nothing to justify the conclusion that a sale is void on account of its not having been so made. I find no repeal of the common law in any shape. If there is a change of the law, there is nothing to invalidate the purchase in this case; no fraud nor collusion, no evidence even that the purchase was made privately, or that the sale was not made in public.

The distributees and creditors have a clear protection for their rights, not only in the care and proper appointment of a suitable and competent person by the Judge of Probate, but by the official bond to cover all delinquencies. They have in addition, the power of removal and the process of injunction of the Court of Chancery, to prevent injury and wrong. To allow them the additional aid of claiming the property, though sold by their own agent, after its value is improved many years after, would be to accumulate remedies in their favor, to the great injury of the public and to private rights.

It is consoling to find that the error or injustice, if any, in the decision, may, by the rules and principles governing in courts of equity, be effectually averted and prevented. Infants are allowed six months, after coming of age, to correct and contest a decree against them. 4 Hen. & Mum., 376; 5 Leigh, 119; 4 J. J. M., 68; 1 Sandford Chy., 103, 129; Bingham on Infancy, 131; Lube's E. Pl., 159, 160; 5 Call, 459.